Arguments not to exceed 15 minutes per side, Mr. Brandt for the appellate. Good morning, your honors. May it please the court, Jeff Brandt. For Mr. Jackson, may I reserve four minutes for rebuttal. You may. Time permitting, I'm hoping to address three of the four issues, briefed and on appeal, denial of the limited right to substitution of counsel, severance, and loss calculation. The Mack case, the Trogeo case, give us the four factors to review for whether a defendant's limited right for substitution of counsel has been violated. One of those is timeliness. And as I've briefed at first blush, that doesn't look good for Mr. Jackson. This is the first day of trial. But based on the type of conflict, it makes sense. It did not become ripe until about a week before trial. And then the next time Mr. Jackson was before the trial court, he raised it. So you admit he knew a week ahead of time? When he filed the disciplinary counsel complaint and then sent that to the court. Why could he have not brought that to the court's attention the week before? To my understanding, the disciplinary complaint was sent to disciplinary counsel and sent to the court. I guess it doesn't get there to the court until right before trial. But he didn't file a specific motion. He did not file a motion. That's correct. He could have written a letter to the judge or something or other. I agree, Your Honor. But I think even if it were a week out, I think we'd have the same argument. It's a little different than the day of. Yes, Your Honor. The day of, as you're talking about, is the request for substitution of counsel timely. And the morning of, I don't know how you can argue with a straight face. It's timely. I'll do my best. And I'm sincere in this. The conflict here is a lack of communication that developed out of a lack of trust. And the lack of trust comes from having an attorney who's yelling at him, telling him, I'm going to nail your butt to the wall for this. This is your own attorney telling you this. These things just didn't happen within the last 24 or 48 hours, though, right? That's correct. Or was it ongoing? It probably happened even before he filed the disciplinary proceeding, which was a week before. I mean, I assume it was happening before that. But it doesn't become ripe until it's proven that the attorney really isn't ready to defend Mr. Jackson for trial. So, again, it's a lack of communication that arises out of a lack of trust that counsel will be ready to defend the case. I can't deny, Judge Griffin, that the yelling and the clashing occurred for weeks. And Mr. Jackson says it himself when he says, yeah, this has been going on for a long time. But she keeps telling me she's going to be ready. And here we are. And she's not ready. And she's not going to present the evidence I'm going to ask her to present. Does the attorney have the discretion to say, I'm going to present this evidence and not this evidence? Absolutely. I can't run from that. But if that's the point that a defendant says, yes, my attorney is not ready. And when it comes to the timeliness, I think it's relevant that this wasn't a surprise to the court or even defense counsel. The court says, you know, I kind of anticipated something like this was going to come up. So if it's not a surprise to the court, I think that helps Mr. Jackson's argument when it comes to timeliness. When it comes to adequacy, the judge didn't ask about the complaint. And we think he relied too much on his perceived, his perception of the competency of defense counsel. Instead of talking about what happened in this case, the judge is saying, hey, this is a good attorney. I've known her for a long time. She'll do a good job. What is she not doing to prepare? What's telling you that she's not ready to defend your case? When it comes to the extent of the conflict, this was not a sham. Even Preston Harrison, a co-defendant, is saying, yeah, she's pretty much been arguing against our case from the beginning. She's accusing Mr. Jackson of crimes that the government's not accusing Mr. Jackson of. This is corroborating evidence that this is not something that's been made up at the last second. And, in fact, it has been going on for months. Yes, could he have written to the judge a week before? Admittedly. But it's not a sham if it's been going on for months and the co-defendant agrees that the attorney is, quote, working against us, and that's page ID 3507. This has to be balanced against the need for the public interest for a trial. We think the conflict is high enough, the lack of defense, to outweigh the need to go to trial that day. For severance, the government's first response is this isn't ripe for appeal. I've probably spent 99% of my first letters to my clients explaining why we're not raising an effective assistance of counsel on appeal. But this was one of the rare cases that we felt the record sufficient. Because the issue is what evidence did the government present against co-defendants that bled over and was harmful for my client? What other evidence is needed to show what that evidence would be? The only question, then, is it strategic to go to trial with and move for severance or allow Joinder? And in this case, we have all the evidence we need that this was harmful, that Joinder was not good for Mr. Jackson. We don't have testimony from the defense attorney, do we, as to why he did not file a motion to sever the trials? We do not have her testimony. That is correct. To say that there is no strategic reason, I mean, we're left to guess, aren't we, at this point? And that's kind of one reason we don't normally decide an effective assistance of counsel on direct appeal. I've handled a number of 2255s, and I can't tell you one where the defense attorney is going to give an affidavit that's favorable to the defendant, saying, you know, I probably should have filed a motion for severance. There are some reasons, or I didn't think of reasons, or whatever. I mean, you say the record is totally developed enough to decide an effective assistance of counsel, but what's missing is anything from counsel as to why there wasn't a motion to sever. The reason posited by the attorneys before the district court was, well, we're working together, and the government uses that phrase. They work together. That's why Joinders is okay for Mr. Jackson. But there's two problems with that. Number one, they admitted that they're working together in order to divide duties, and they're certainly not working together so that one attorney is trying to exonerate the other client. That's just not going to happen. So the reason given in the district court, that's not plausible. And on the other side is all the negative evidence that came in. I'm Mr. Jackson, and I'm sitting with two co-defendants, and the jury gets to hear that I'm a signatory on the account, and I'm somewhat responsible for the money going to my co-defendants. But the government is able to get up in closing and say to the jury they went out and bought a 20-gun gun closet. They had an in-ground pool put in. They bought an Escalade and a BMW. That's what they're doing. None of this would have been relevant against Mr. Jackson, and that's why we feel that the severance, ineffectiveness of the counsel for lack of severance is meritorious. When it comes to loss, the clearly erroneous standard is that it not only be inexact but outside the universe of acceptable computation. But we also submit that the Polson case, which we cite, and I believe, Your Honor, Judge White wrote, supports a de novo standard for the methodology behind the loss calculation. I think our best case here is Turner, which I think you also authored, and Judge Griffin, you were on that panel. It says you have to prove but-for cause for loss for everybody. Schaefer Smith invested $3.5 million. We think none of that should be included. But at worst, you've got to take $1 million away because Kevin Foster stole it. What's the but-for causation for Mr. Jackson for Kevin Foster stealing it, taking that money without authorization? Zero. And what about all the defendants or all the investors that didn't testify and for which there was zero testimony that they relied on any false statement to invest, that they would not have invested if it weren't for some fraud? And the Turner case says you've got to prove that but-for in order to include that in loss. That's $2.8 million that was included in loss. Without the $2.5, without the $2.8, or even if it's $1 million from Schaefer Smith and $2.8 from the other investors, we do not have $7 million of loss. Thank you. Thank you, Mr. Frank. We have your rebuttal time. Thank you. Good morning. Good morning, Your Honors. Mary Beth Young on behalf of the United States. I'll begin, as counsel did, with the substitution of counsel issue. And I'd like to just clear a little underbrush from the briefs. Counsel referred today to the four-factor test from this Court's decisions in Mack and Isles, and the United States agrees that's the applicable test. There was some reference in the briefs to some other case law that did not involve appointed counsel, and the United States would just observe that the analysis differs significantly for retained counsel versus appointed counsel, so that some of the cases cited, including Gonzalez-Lopez, which involved and expressly limited its analysis to situations involving retained counsel, should be read carefully. Applying that four-factor analysis that does apply in this context, the first issue, of course, is timeliness, which counsel notes at first blush does not look promising for his client. The United States would suggest at second blush as well it does not look promising. It was the morning of trial. The disciplinary grievance which was represented to have been filed, there's nothing in the record regarding that having been provided to the court prior to that day in any fashion. This was the first the court or counsel was aware, as was discussed in the transcript, of that grievance having been filed, and there had been no motion or suggestion in any way of substitution being necessary. So timeliness cut very strongly against the suggestion for substitution. This was counsel who had been appointed ten months prior to the day of trial, and Jackson's description of his concerns with counsel went back to very early on. In fact, he complained in discussing her lack of confidence in him that within a week or two, she was bringing him a plea agreement, which, of course, counsel can hardly be faulted for if one had been proposed by the United States. But it also illustrates there had been a longstanding concern. Timeliness is a significant negative for the request. The second factor, the adequacy of the district court's inquiry. If you look at that inquiry at 3499 to 3526, the court did a very substantial inquiry into the nature of Jackson's concerns. He heard from Jackson. He heard from Jackson's counsel. He heard from co-defendant and co-defendant's counsel who had been in a joint defense agreement, and he circled back and heard further from Jackson. Certainly an adequate inquiry, and it went far beyond. And while the court did note his familiarity with counsel, that was a small part of the court's observations. The third factor, whether the conflict between the attorney and client was so great that it resulted in a total lack of communication, preventing an adequate defense. Jackson's explanation focused on a variety of things. Counsel used harsh words to him, acted like he was guilty. Counsel was, and this was a key part of it, was not receptive to certain financial ledgers that he felt should be used as an exhibit, and she felt had authenticity issues. This is not the sort of thing of which total breakdown in communication is made. And even that dispute was of recent vintage. Counsel explained that there had been voluminous e-mail exchanges between counsel and the defendants, up to 10 to 15 per day, and that those were ongoing. I believe the week prior, Jackson had stopped participating in those e-mail discussions. Again, the district court noted that that was self-imposed. It was apparently based on, as Jackson explained, his dissatisfaction with not his own counsel's reference, but his co-defendant's counsel's reference to some financial information the defendants had provided as being BS. So your position really is that it was less an inability to communicate than a disagreement in terms of a certain strategy and other aspects of the trial. Yes. Jackson, I think, perhaps had himself stopped wanting to participate in the communication because he was annoyed with how counsel was handling some things. He didn't take any initiative to request a change of counsel from the judge until the day of trial. Until the day of trial. Until the day of trial. And as this court pointed out in Jennings, what is required is a showing of more than communication with counsel, which the defendant feels is unsatisfactory, which the United States would submit is the most that could possibly be gleaned from this record. The fourth factor cut very strongly against substitution. The fourth factor is whether there are countervailing considerations, public interest in a timely proceeding. And here the jury, prospective jurors, were in the building. Two out of the three counsel for the United States were from out of state. Witnesses were in the building from out of state. The district court did not abuse its discretion in declining this request. Turning briefly to the ineffective assistance of counsel argument, the United States' primary position in our brief is that this should not be addressed on direct appeal. Certainly the first prong of the Strickland analysis, deficient performance, could not be established on the present record. There's been no evidence taken from counsel regarding the reasons for any decisions, whether or not severance might reasonably be sought. Beyond that, if you look, as our brief goes on to say, it's our position, and in fact severance could not reasonably have been sought, that prejudice could not be established. This is a situation involving jointly indicted co-defendants. Severance in that context is very disfavored. What's pointed to here is spillover evidence based on the Harrison's extravagant spending primarily. But the United States submits that evidence would have been similarly admissible even if Jackson were tried alone. This is spending from an account that Jackson directed funds to. Investor funds go into an account on which Jackson is the sole signatory. He wires them out to this other fund, the Forever Now account, from which the extravagant spending occurs. So does the fact that conspiracy was charged in the indictment support the argument that you just made, or does it cut against that? I mean, does the fact that the conspiracy charge was there affect this materially one way or the other, in terms of whether or not that spending evidence would have come in? I know that the conspiracy umbrella brings in a lot of things, but would that have swept in the spending information that counsel says? Yes. It's critical to the nature of the appropriateness of the redirection of funds. What's the nature of this account over here to which funds are being directed? And, in fact, there were suggestions below by the defendants that, oh, that was actually a holding account. Nothing wrong with that account. Well, it was asked to either defendant, completely appropriate for the United States to demonstrate, no, this is not a holding account for Imperial. This is something that's being used to buy guns and cars, buy whomever. There's nothing linking that fund to your client, right? To Jackson? Yeah. Nothing linking. He was not a signatory on this fund over here, but the link is that he was, well, he's convicted of substantive money laundering counts for transferring funds over to it over and over again. But nothing that came out of that fund went to him? I don't believe there was evidence of him using funds from this, but, nonetheless, the nature of the fund had to be established in order to make out that the redirection was inappropriate. If there are not further questions on the ineffectiveness of counsel argument, I'll move to loss. The district court concluded that the loss here was $9.3 million, and that was based on the amount of investments from the 19 identified investors. The argument appellant makes is that that was inappropriate because it was not established that each of the 19 investors, in particular 14, who he identifies as, I believe, 13 as being non-testifying, and one whose testimony he doesn't believe supports, that would be Schaefer Smith, whose testimony he doesn't believe supports the needed link to Jackson. The argument, again, is there was no showing that all of those investors relied on fraudulent information from Jackson. The United States submits this fails for at least four reasons. First, the alternative he suggests on appeal, which basically subtracts out those 14 investors, leaving a total, in his brief, of $2.2 million, was nowhere mentioned in the district court. Below the position was, oh, loss cannot be determined, so you're just going to have to use gain, which is $268,000. So the $2.2 million alternative was not put on the table for the district court. In looking at whether the district court made a reasonable estimate, the choices that had been presented were the total investor losses versus $268,000. In addition, given the pervasiveness of Jackson's fraud, which the district court was well aware of, and tried the case, Jackson's consistent role indirectly and indirectly providing fraudulent information to investors, it was certainly a reasonable estimate, absent evidence to the contrary, which there was not evidence to the contrary, to view all investors as having relied and been influenced by that misinformation. Third, to look at whether there was investor reliance on particular statements by Jackson is an unnecessarily narrow inquiry. Actual loss looks at whether there were reasonably foreseeable pecuniary harm that resulted from the offense. The offense, not necessarily specific statements, and this court's decisions in Turner, in Healy, and in Washington, which the United States brief cites each of those, illustrate that where an offense undermines the company's ability to succeed, total investor losses are an appropriate estimate of loss. I was surprised to hear that he thinks Turner is his best case, because I think it's mine. In Turner, there was a situation where there was an attempt. There were some business expenses here. Yeah, they made some oxy water. In Turner, yeah, they put together their various ape-focused business opportunities. But that didn't change the fact that the fraud was so pervasive that the business was undermined, and it was undermined for all investors, and that was considered a reasonable estimate of loss. Finally, I would note that the district court, in its 3553 analysis, looked to the 2015 guidelines, which were coming into effect a month later. Under those 2015 loss tables, the same 78 to 97-month range would apply for any loss between $3.5 million and $9.5 million, I believe. Here, the district court found $9.3 million in loss. In order for this estimate to have been unreasonable in a way that would have affected that plus 18 under the 2015 guidelines, this would not only have had to be unreasonable, it would have had to be quite unreasonable. I just want to ask you, on the stolen $2.3 or $4 million, your position is you don't really look at that. You just look at the total investor loss for the guideline calculations, and that is irrelevant, not harmful? Tell me. Right, so Schaefer Smith is the investor as to whom there's an allegation that the last $1 million of the $3.5 million total may not have been directly authorized by Schaefer Smith. As to the first $2.5 million, the United States would note those were actually subject of one of the substantive wire fraud convictions. So Jackson was directly linked by the jury to those wires. As to the last $1 million, the United States would submit that there, too, the fact that Schaefer Smith may not have directly invested those funds doesn't change the fact that the fraud was pervasive. It undermined the business and his ultimate loss of the funds. I was interested in the specific numbers, but thank you. Thank you. Thank you, Ms. Young. Any further questions? Judge White. All right, thank you. Mr. Brandt, you've got rebuttal. Thank you, Your Honors. Turner's our best case because but for was applied for every dollar. And yes, Turner recognizes that actual loss is the reasonably foreseeable pecuniary harm that resulted from the offense. But the very next paragraph, and that's page 268, says the loss must be caused by the defendant's fraud, quoting the Rothwell case. The three cases that the government cited and then I cite in the reply, each one of them are distinguishable and support us because but for cause is applied for every dollar. Every defendant in those three cases lost, but they lost for different reasons than we have in Mr. Jackson's case. In the first two cases, it was a Bernie Madoff type of situation. The entire thing was a fraud from the very beginning. There wasn't $700 invested in equipment that could have gone just to somebody's pocket. It was very different. And the Turner case definitely supports the position that a stolen $1 million or where there's zero evidence, not a preponderance of the evidence, but that another $2.8 million, there's no but for analysis at all. But the money ended up in the business, right? The money was invested, but that's not the test. Did the money get invested? The test is but for fraud, would they have invested anyway? That's why every single one of the witnesses that the government put on the stand at trial was asked, now, if you would have known this, that, or the other, would you have invested? That's the entire point, to prove but for cause. And that evidence does not exist for $1 million for Mr. Smith, if not $3.5 million, and certainly another $2.8 million. I don't think plain error is furthered in a case where the argument is, please calculate under the guidelines what the loss is, and please only use those things where preponderance of the evidence shows causation. This exact argument, the cases I'm citing, no. But when a district court has the legal question before it and it passes on it, we ask that the court not apply plain error. And even if it applies plain error, please look to the reasons for the departure. The judge, the district court doesn't say, I'm only giving a departure because of the two-point reduction that's about to happen. That's only one of the factors. So I think we have prejudice, even if there is a miscalculation of the guidelines, there's a reasonable probability that there would have been a lower sentence. When it comes to severance, the government in its brief, the government wants to say right now, oh, the evidence would have been admissible anyway. But in its brief it says the opposite. The evidence did not implicate Jackson in the tax fraud and structuring charges for which the Harrisons alone were tried. Well, if he's not charged with those, how are you going to get the evidence of co-defendants, how they spent the money? What the government had been allowed to do in a trial against Mr. Jackson, what they did here, and that is spend pages of closing argument, emphasizing the lavish, out-of-control spending on luxury goods by the Harrisons that did not occur at all for Mr. Jackson. And then finally, when it comes to the substitution of counsel issue, the fact that this was early on shows the extent. Even if we lose on timeliness, okay, timeliness, let's say I couldn't come up with a straight face and I was laughing the entire time. Look at the other three factors. This is a balancing. They're not you have to meet all four. These are four factors to take into consideration. The fact is this is an attorney who cannot convince her client she's doing her job and can do the right thing at trial. Thank you, Your Honors. Any further questions for Mr. Brandt? Mr. Brandt, I noticed that you're appointed pursuant to the criminal justice act. I wasn't in this one. That changed. Oh, you were detained now? Yeah. Okay. But thanks anyway. I wanted to thank you for your service anyway and a good job for your client in any event. Case will be submitted. I assume there are no more cases on the oral argument. Doug? There are none. All right. You may adjourn the court. The court is now adjourned.